UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARY G. ATKINSON,

Plaintiff,

-vs-                                                    Case No.  6:04-cv-1130-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.
_____

## MEMORANDUM OF DECISION

Plaintiff Mary G. Atkinson ["Atkinson"] appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth

below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On July 30, 2001, Atkinson filed claims for disability insurance benefits and supplemental

security income, claiming disability as of May 1, 2001.  R. 58-60.  On September 9, 2003, the

Honorable Apolo Garcia, Administrative Law Judge ["ALJ"], held a hearing on Atkinson's claim in

Daytona Beach, Florida.  Atkinson testified, and her attorney, Maria Santana, appeared with her.  R.

369-89.

On September 18, 2003, the ALJ ruled that Atkinson was not entitled to benefits.  R. 14-20.

Following a review of the medical and other record evidence, the ALJ found that Atkinson had severe

impairments, but did not have an impairment or combination of impairments that met or equaled a

listed impairment.  R. 19, Findings 3-4.  The ALJ also found that Atkinson's testimony regarding her limitations was essentially credible.  R. 19, Finding 5.  Further, the ALJ determined that Atkinson retained the RFC to perform light work.[1]  R. 19, Finding 7.  Accordingly, the ALJ determined that Atkinson could return to her past relevant work, and therefore concluded that Atkinson was not disabled.  R. 19, Findings 8-10.

Atkinson timely appealed the ALJ's decision to the Appeals Council.  R. 8.  Finding no error or abuse of discretion, the Appeals Council denied review on March 26, 2004.  R. 5-8.  On July 23, 2004, Atkinson timely appealed the Appeals Council's decision to the United States District Court for the Middle District of Florida.  Docket No. 1.  On April 18, 2005, Atkinson filed a memorandum of law in support of her appeal of the denial of review.  Docket No. 13.  On June 17, 2005, the Commissioner filed a memorandum in support of her decision that Atkinson was not disabled.  Docket No. 14.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Atkinson assigns three errors to the Commissioner's decision: 1.) improperly determining that Atkinson had an RFC to perform light work; 2.) erroneously finding that Atkinson's mental impairment was not severe; and 3.) improperly evaluating Atkinson's subjective complaints of pain.  Pl.'s Brief at 2-15.  The Commissioner responds that her decision was supported by substantial evidence and was decided by proper legal standards.  The Commissioner asserts that she properly evaluated Atkinson's RFC, mental impairments, and subjective complaints.  Def.'s Brief at 4-19.

---

[1]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  If someone can do light work, the Commissioner determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b).

### III.   THE STANDARD OF REVIEW

#### A.   Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.**     **Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

-4-

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.

1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

**C.     Standard of Review for Evidence Evaluated by Appeals Council**

After the ALJ's decision — but before the Appeals Council's decision — Atkinson submitted additional medical records from Dr. Walsh covering a period from September 10, 2003 through October 23, 2003. R. 4A, 358-68. The Appeals Council properly made them a part of the record, and also considered them in denying review. R. 5, 8. The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g). Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review, the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405 (g). *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. 20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986)

-6-

(en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad. *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. § § 404.970 (b); 416.1470 (b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Secretary of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).

Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 1, ¶ 2.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council (if any) in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970 (b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by

considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review. The Commissioner's regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405 (g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review," does not have the effect of avoiding judicial review of the Appeals Council's decisions. *See Sims*, 120 S.Ct. at 2086; *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405 (g)).

## IV.  __THE LAW__

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   __Treating Physicians__

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally

entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.   Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Atkinson v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and

explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### C.    **Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### D.    **The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 ©).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's

impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), ©).  If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.      The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in eight diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A "marked"

-14-

degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or,

-15-

conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information

-16-

from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Affective Disorders is as follows:

**12.04 <u>Affective Disorders</u>**:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life;  it generally involves either depression or elation.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A.       Medically documented persistence, either continuous or intermittent, of one of the following:
        1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities;  or
        b. Appetite disturbance with change in weight;  or

  c. Sleep disturbance;  or

  d. Psychomotor agitation or retardation;  or

  e. Decreased energy;  or

  f. Feelings of guilt or worthlessness;  or

  g. Difficulty concentrating or thinking;  or

  h. Thoughts of suicide;  or

  i. Hallucinations, delusions or paranoid thinking;  or

  2. Manic syndrome characterized by at least three of the following:

  a. Hyperactivity;  or

  b. Pressure of speech;  or

  c. Flight of ideas;  or

  d. Inflated self-esteem;  or

  e. Decreased need for sleep;  or

  f. Easy distractibility;  or

  g. Involvement in activities that have a high probability of painful consequences which are not recognized;  or

  h. Hallucinations, delusions or paranoid thinking; or

  3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.  Resulting in at least two of the following:

  1. Marked restriction of activities of daily living;  or

  2. Marked difficulties in maintaining social functioning;  or

  3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

  4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

An individual may meet the separate Listing for mental retardation if he or she has a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

### F.    <u>Other Work</u>

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of

work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level noted by the exertional limitations.  *Foote*, 67 F.3d at 1559.

### 1. <u>Pain</u>

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

-20-

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### 2.  **Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.   APPLICATION AND ANALYSIS

### A.   The Facts

Born on February 17, 1948, Atkinson was fifty-five years old at the time of the ALJ's decision.[2] R. 58.  Atkinson has a high-school education and an Associate of Arts degree, and her past relevant work experience includes work as an accounting clerk and telephone salesperson.  R. 91, 96, 372-74. Atkinson claims an inability to work beginning May 1, 2001.  R. 58.

On April 12, 2001, Atkinson went to Maria Antonio-Miranda, M.D., for evaluation of right ventricular strain.  Atkinson presented with a history of carcinoid endobronchial lesion, status post left upper lobectomy followed by complete pneumonectomy (removal of lung).   She complained of shortness of breath with as little as nine steps.  The impressions were pulmonary hypertension and right ventricular strain, history of carcinoid lobectomy with completed pneumonectomy without recurrence, and mild airflow obstruction.  Treatment comprised medication.  R. 234-36.

On May 1, 2001, Leon A. Yasay, Jr., M.D., treated Atkinson in the ER.  Atkinson was admitted with complaints of chest pressure, shortness of breath, and heart palpitations.   The assessments were unstable angina, bradycardia, ischemia, chronic bronchitis, and anxiety.  Dr. Yasay opined that Atkinson should undergo cardiac catheterization.  Atkinson was admitted to the coronary care unit for observation and given medication.  R. 114-16.

On May 16, 2001, Atkinson went to the hospital with a diagnosis of symptomatic atrial and ventricular ectopy, and was admitted for empiric flecainide therapy.  The impression was palpitations due to symptomatic premature ventricular contractions and atrial premature complexes.  R. 168-70.

---

[2]She is now fifty-seven years old.

On May 22, 2001, Atkinson was admitted to the hospital.  The diagnoses were palpitations due to ventricular and atrial complexes, development of severe bradycardia, and no evidence of structural heart disease with normal coronary and left ventricular function post cardiac catherization.  J. Timothy Walsh, M.D., treated Atkinson with a loading of flecainide, resulting in excellent suppression of her ventricular ectopy.  Dr. Walsh gave Atkinson a good cardiac prognosis.  R. 131-32.  On June 13, 2001, Atkinson returned to Dr. Walsh for a follow-up visit.  Atkinson stated that her medication had helped her, but she was experiencing nightmares.  Dr. Walsh concluded that Atkinson was "enjoying very good clinical suppression of symptomatic ventricular and atrial ectopy."  He did not know the source of her nightmares.  R. 165-67.

On July 6, 2001, a CAT scan of Atkinson's right lung showed non-calcified nodules.  Maria Antonio-Miranda, M.D., opined that the nodules were too small for diagnostic studies at that time  and advised follow-ups for two years.  R. 227.  On July 19, 2001, Atkinson went to Dr. Yasay  to have disability papers filled out.  Dr. Yasay noted that Atkinson had chronic obstructive pulmonary disorder, anxiety/panic attacks, and chronic knee and ankle pain.  He also noted that she was unemployable.  R. 252-53.

On August 13, 2001, Atkinson returned to Dr. Walsh.  Atkinson denied an increase in cardiac palpitations and was reasonably satisfied with the relief provided by medication.   She noted that a recent CT scan had identified two new suspicious areas in her right lung.  Dr. Walsh opined that she was doing well from a cardiac standpoint, and stated that Atkinson was reasonably concerned about the new lung findings.  R. 162-63.

-23-

On August 20, 2001, Dr. Yasay completed a questionnaire for disability purposes.  In response to a question asking if Atkinson suffered from a mental impairment that significantly interfered with her daily functioning, he selected the "yes" answer choice.  Dr. Yasay further noted that he prescribed medication for her condition, but did not refer her for psychiatric or psychological treatment.  He also noted that Atkinson's chest discomfort was resolved.   R. 250-51.

On October 3, 2001, J. Nicholas Prewett, Ph.D., performed a consultative psychological evaluation.  Atkinson stated that she baby-sat her infant grandson two days per week, enjoyed playing croquet, watching TV, and exercising.  She had frequent contact with her children, completed household chores, and cooked.  She had occasional sleeplessness, a good appetite, and denied symptoms of depression or anxiety, except that she felt lonely at times.  Dr. Prewett's only diagnosis was a Global Assessment of Functioning[3] score of 85.  R. 152-55.

On October 23, 2001, state agency physician Val J. Bee, Psy.D., performed a psychiatric review technique assessment.  Dr. Bee found that Atkinson had an anxiety disorder, but no severe mental impairment.  He determined that Atkinson had mild limitations in activities of daily living, maintaining social functioning, concentration, persistence, or pace.  R. 203-16.

Also on October 23, 2001, Frederic F. Porcase, Jr., D.O., performed a consultative physical examination.  Atkinson's heart rate and rhythm were regular and her chest was clear.  Examination

---

[3]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] at 32.  Axis V of the DSM-IV's multiaxial evaluation assesses a patient's current GAF on evaluation, as well as the patient's highest GAF level in the past year.  DSM-IV at 30 - 33.  A GAF code of 81-90 indicates absent or minimal symptoms (e.g., mild anxiety before an exam),good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). DSM-IV at 32.

showed a full range of motion of the cervical, thoracic, and lumbosacral spine, including forward, back, and side bending, and rotation.  Dr. Porcase performed an oxygen saturation test, which was 97%.  He concluded that Atkinson did not have hypertension, chest pain, congestive heart failure, or clinical signs of a respiratory impairment.  However, she did have mitral valve prolapse.  Further, Atkinson had no spine abnormalities or motor deficits in her extremities, and she had a normal gait, station, grip strength, and fine manipulation.  Dr. Porcase concluded that Atkinson appeared quite stable and was "certainly" capable of more than light and sedentary activities.  R. 201-02.

On October 31, 2001, state agency physician Reuben E. Brigety, M.D., performed a physical RFC assessment.  He concluded that Atkinson could lift/carry twenty pounds occasionally, ten pounds frequently, sit/stand/walk for six hours, had unlimited pushing/pulling ability, could occasionally climb, frequently balance, stoop, kneel, crouch, crawl, and should avoid fumes, odors, dust, gases, and concentrated exposure to hazards.  In all other respects, Atkinson had no limitations.  R. 217-24.

On November 28, 2001, Atkinson returned to Dr. Yasay complaining of right arm pain, right shoulder impingement resulting in pain, and insomnia.  Dr. Yasay noted that Atkinson had reduced flexion in her back due to pain.  Medications were prescribed for insomnia.  R. 244-47.[4]

On February 8, 2002, state agency physician Patricia A. Boger, Ph.D., completed a psychiatric review technique assessment.  She concluded that Atkinson had an anxiety disorder, but no severe mental impairment or any functional limitations.  R. 282-95.

---

[4]These handwritten records are barely legible.  Therefore, the Court relies entirely on Atkinson's characterization of the records.

On February 4, 2002, Atkinson underwent x-rays of the thoracic, cervical, and lumbar spine. All areas of the spine had mild degenerative changes and osteopenia (bone loss), but the bony structures appeared intact with no acute processes.  R. 241-43.

On February 15, 2002, state agency physician Donald Warren Morford, M.D., performed a physical RFC assessment.  He concluded that Atkinson could lift/carry twenty pounds occasionally, ten pounds frequently, sit/stand/walk for six hours, had unlimited pushing/pulling ability, could occasionally climb, balance, stoop, kneel, crouch, crawl, was limited in the manipulation limitation of feeling on the right side, and should avoid concentrated exposure to hazards.  In all other respects, Atkinson had no limitations.  R. 296-303.

On April 22, 2002, Atkinson underwent an MRI of her spine and shoulder.  The cervical spine was normal, showing degenerative changes at C5-6 with a bulge eccentric to the right with no evidence of cord or nerve root impingement.  Atkinson's lumbar scan was also normal, showing disc and facet degenerative changes at L4-5 with no protrusions.  Atkinson's right shoulder was also normal, showing hypertrophic degenerative changes of the acromioclavicular joint tissues. R. 321-23.

On May 15, 2002, Atkinson returned to Dr. Antonio-Miranda for a follow-up of her right lung nodules.  The impression was stable airflow obstruction, and he advised Atkinson to continue her medication and to follow-up for her right lung nodule.  R. 313.  On June 19, 2002, Atkinson underwent an MRI of the left knee.  The impression was mild degenerative change, but was otherwise a normal study.  R. 320.

On September 4, 2002, Richard K. Gaines, M.D., evaluated Atkinson's right shoulder. Atkinson had a minimally restricted range of motion of the cervical spine and full mobility of the right

-26-

shoulder with mild impingement.  The assessment was rotator cuff syndrome.  R. 353.  Dr. Gaines administered an injection and referred her for physical therapy.  R. 352-54.

On May 19, 2003, Atkinson returned to Dr. Walsh for a follow-up visit.  She reported feeling well, and denied having palpitations during the day, although she did have palpitations that awakened her at night.  Dr. Walsh found that Atkinson had excellent control of her cardiac dysrhythmia.  He added that because her dysrhythmia was so well-controlled, it was unlikely that her sleeplessness was related to an arrhythmia.  He advised her to continue her medication, and prescribed Benadryl.  R. 336-38.

On July 2, 2003, Dr. Walsh completed a cardiac RFC questionnaire in which he noted that Atkinson was incapable of even low stress jobs, and further noted that her physical impairments caused emotional difficulties such as anxiety and depression.  He stated that Atkinson could sit for thirty minutes, stand for fifteen minutes, and lift ten pounds occasionally.  Dr. Walsh found that Atkinson needed to shift positions at will, and required unscheduled breaks every five to fifteen minutes.  He further stated that Atkinson must avoid all exposure to fumes, gases, dusts, odors, and hazardous machinery.  Due to her impairments, she would be absent from work about four days per month.  R. 314-18.

On September 10, 2003, Dr. Walsh implanted a cardiac pacemaker for sick sinus syndrome with severe bradycardia.  Dr. Walsh noted that her medication had treated her symptoms successfully over many years.  He observed that over time, it became necessary to increase her medication. However, she was unable to tolerate increased dosage because it caused extreme bradycardia.  Her intolerance to medication warranted implantation of the pacemaker.  R. 365-68.  Atkinson went to Dr.

Walsh for a follow-up on September 23, 2003. She described generally feeling well, having less shortness of breath, and decreased fatigue. Overall, she was satisfied with her quality of life. R. 362-64.

On October 23, 2003, Atkinson returned to Dr. Walsh for complaints of pain in the left neck and shoulder radiating to the left arm. Dr. Walsh reviewed the results of an x-ray of the cervical spine performed ten days earlier. The results showed degenerative changes at C5-6 with no acute bony abnormalities. Atkinson also informed him that she had lost her appeal for disability benefits, and stated that some information regarding her arthritis was not included. Therefore, she was feeling depressed and "blue." Dr. Walsh suspected that her spinal pain was a flare up from being in a prolonged supine position for implantation of her pacemaker. He prescribed medication, but opined that her symptoms would resolve within one month and she could discontinue it. R. 360.

**B.    The Analysis**

**1.    The ALJ Properly Determined Atkinson's RFC**

Atkinson contends the ALJ erroneously accorded greater weight to the opinions of state agency physicians rather than to her treating cardiologist, Dr. Walsh. Specifically, Atkinson argues that the ALJ rejected Dr. Walsh's responses to a questionnaire that indicated that Atkinson was disabled. Atkinson is wrong, and the ALJ gave adequate reasons for discounting Dr. Walsh's opinions. Indeed, Dr. Walsh's questionnaire responses are not consistent with his own clinical findings and conflict with other evidence.

Dr. Walsh is Atkinson's treating cardiologist. He treated Atkinson for more than thirty months from May 2001 through at least October 2003 for irregular heartbeat. The ALJ must give substantial

-28-

weight must be given to Dr. Walsh's opinions, diagnoses, and medical evidence unless there is good cause to do otherwise. The ALJ may discount Dr. Walsh's opinion regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. Nevertheless, the ALJ may accord even conclusory statements by Dr. Walsh such weight as is supported by clinical or laboratory findings and other consistent evidence of Atkinson's.

Dr. Walsh's treatment of Atkinson for irregular heartbeat comprised medication. In July 2003, Dr. Walsh completed a "Cardiac Residual Functional Capacity" questionnaire. Question 8b asks "To what degree can your patient tolerate work stress?" In response, Dr. Walsh endorsed the "Incapable of even 'low stress' jobs" answer choice. Other questions inquired about Atkinson's functional limitations. In response, Dr. Walsh endorsed answer choices so extreme that they indicated that Atkinson was disabled. Atkinson relies solely on these questionnaire responses in arguing that the ALJ erroneously determined her RFC.

Atkinson's reliance is flawed. Dr. Walsh's responses to the questionnaire provide no supporting clinical or laboratory findings. More importantly, in his own clinical impressions prior and subsequent to the questionnaire, Dr. Walsh never determined that Atkinson had such severe limitations. Rather, he consistently found that Atkinson was doing well. In June 2001, he opined that Atkinson was "enjoying very good clinical suppression" of her cardiac symptoms. In August 2001, he found that Atkinson was "doing well" from a cardiac standpoint. In March 2003, Dr. Walsh determined that she "has had excellent control" of her heart symptoms. In September 2003, he noted that Atkinson's symptoms had been treated successfully with medication for several years, but that she was unable to tolerate an increased dosage. Therefore, he implanted a cardiac pacemaker.

Thereafter, Atkinson reported an improvement in her symptoms and stated that she was satisfied with her life.  Finally, in October 2003, Dr. Walsh found that Atkinson had "good clinical suppression" of her irregular heartbeat.  In light of Dr. Walsh's clear and consistent clinical findings over a thirty-month period, it is obvious that the conflict between his questionnaire responses and clinical impressions should be resolved in favor of the latter.  Moreover, no other treating or examining physician made clinical findings as grave as Dr. Walsh's questionnaire responses, and two state agency physicians determined that Atkinson could perform light work.  Thus, the ALJ properly accorded limited weight to the questionnaire, and properly assessed Atkinson's RFC.

### 2. The ALJ Properly Determined that Atkinson Has No Severe Mental Impairments

Next, Atkinson contends that the ALJ failed to determine that her mental impairment was severe.  This argument is completely meritless.  The record shows barely minimal, if any, evidence of mental impairments.  Throughout the longitudinal period covered by the medical records, Atkinson received no continuing treatment for mental impairments.  Instead, she had merely sporadic complaints of depression and anxiety.

In August 2001, Dr. Yasay, a treating physician, responded affirmatively to a questionnaire asking if the claimant had a mental impairment that significantly interfered with her daily functioning.  He also noted that he prescribed medication for her impairment, but he did not refer for mental treatment.  In October 2001, Dr. Prewett performed a consultative psychiatric evaluation.  Atkinson denied depression or anxiety.  Indeed, her GAF score of 85 showed absent or minimal symptoms.  Later that month, a non-examining consultative psychologist determined that she had no severe mental impairment and just mild limitations in activities of daily living and social functioning.  In February

-30-

2002, another non-examining consultative psychologist determined that she had no severe mental impairment and no functional limitations at all.  Plainly, substantial evidence supports the ALJ's conclusion that Atkinson has no severe mental impairment.

### 3.     The ALJ Properly Evaluated Atkinson's Subjective Complaints

Finally, Atkinson argues that the ALJ failed to properly evaluate her subjective complaints of pain.  Specifically, she submits that her back, shoulder, and hand condition caused totally disabling pain.  Again, Atkinson's argument is meritless.  The evidence shows no underlying medical condition of such a severity that can be reasonably expected to give rise to the alleged pain.

The evidence establishes that Atkinson has chronic back pain and reduced range of motion of the cervical and lumbar spine due to degenerative disc disease, but the evidence does not support Atkinson's allegations of totally disabling pain.  All of Atkinson's treating and consultative physicians have found only mild limitations from her physical impairments.[5]  In October 2001, Dr. Porcase, an examining consultative physician, determined that Atkinson had full range of motion of the cervical, thoracic, and lumbosacral spine with no abnormalities.  She had normal gait, station, grip strength, fine manipulation, and no motor deficits.  He concluded that she was "certainly" capable of more than light work.  Later that month, Dr. Brigety, a non-examining consultative physician, determined that Atkinson could perform light work.  In November 2001, Dr. Yasay, a treating physician, found that she had reduced flexion of the back, but he did not prescribe any continuing treatment.  In February 2002, Dr. Morford, a non-examining consultative physician, determined that she could perform light work.  In September 2002, Dr. Gaines, a one-time examining source, found a minimally restricted

---

[5]As established above, Dr. Walsh's questionnaire responses of July 2003 were not supported by substantial evidence and do not warrant significant weight.

range of motion of the cervical spine and full mobility of the right shoulder with rotator cuff syndrome.  Most recently, in October 2003 (about one month after the ALJ's decision), Dr. Walsh, a treating physician, determined that Atkinson had a mere flare-up of spinal pain after being put into a prolonged supine position for implantation of a pacemaker one month earlier.  Although he prescribed mediation, he opined that the symptoms would resolve themselves within one month.

In addition to the clinical impressions of Atkinson's physicians, radiological scans have consistently demonstrated a complete absence of disabling pain.  In February 2002, x-rays of the thoracic, cervical, and lumbar spine were normal, showing only mild degenerative changes and bone loss.  Similarly, in April 2002, an MRI of the cervical and lumbar spine and right shoulder was normal, showing only degenerative changes.  An MRI of the left knee in June 2002 was normal, revealing only mild degenerative changes.  Finally, an x-ray of the cervical spine in October 2003 was also normal, showing only degenerative changes.  In sum, substantial evidence shows no existence of an underlying medical condition of such a severity that can be reasonably expected to give rise to the alleged pain.

## VI.   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**.  The Clerk should enter a judgment.

**DONE and ORDERED** this 26th day of July, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R.  Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Apolo Garcia
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL              32817